IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

KENT ANDREWS,                           *
                                        *
                    Plaintiff,          *
                                        *
vs.                                     *            No.3:05cv000197 SWW
                                        *
                                        *
                                        *
STEEL RELATED TECHNOLOGY,               *
                                        *
                    Defendant.          *

<u>MEMORANDUM AND ORDER</u>

This is a case of alleged employment discrimination on the basis of age and retaliation

and is brought pursuant the Age Discrimination in Employment Act of 1967 ("ADEA"), 29

U.S.C. §§ 621 *et seq.*  The matter is before the Court on motion of the defendant, Steel Related

Technology ("SRT"), for summary judgment [doc.#25].  The plaintiff, Kent Andrews, has

responded in opposition to SRT's motion, and SRT has filed a reply to plaintiff's response.

Having carefully considered the matter, the Court finds that SRT's motion for summary

judgment should be and hereby is granted.


I.

Plaintiff began work for SRT in July 1998 as an assembly worker and was terminated

from his employment on March 21, 2005.  At the time of his termination, plaintiff was 55 years

of age.

SRT states that during his approximately seven years with SRT, plaintiff's supervisors

and SRT management cited plaintiff for disciplinary infractions on a number of occasions (which

are set forth in SRT's statement of undisputed facts) and plaintiff admits that during the time he worked with the present management team and supervisors, he had nine disciplinary incidents. Def.'s St. of Undisp. Facts at ¶ 4; Pl.'s Resp. to Def.'s St. of Undisp. Facts at ¶ 4.  One of these incidents resulted in plaintiff being suspended for three days in 1999 for insubordination when plaintiff did not follow his supervisor's directive to help train new employees, plaintiff admitting that he stated to his supervisor that he "didn't have time to train new employees."  Another incident resulted in a three-day suspension in 2002 for complaining about job assignments, with plaintiff claiming his problem was with how the other shift was doing their work.  Regardless, plaintiff states that these disciplinary incidents arose from less serious rule violations and, citing pages 19 and 20 of plant manager Mike Bruce's deposition, states that SRT's corrective action procedures for dealing with improper and unacceptable conduct were successful as applied to plaintiff.  In fact, Bruce does not state that the corrective action procedures were successful as applied to plaintiff but states only that correcting improper and unacceptable conduct is the goal of the corrective action procedures.

In any case, the incidents leading up to plaintiff's termination from SRT occurred on Thursday, March 17, and Friday, March 18, 2005.  Def.'s St. of Undisp. Facts at ¶ 28.[1]  Plaintiff wanted to come in to work on Friday, March 18, his day off, to work overtime.  In his deposition, plaintiff initially denied ever having any conversation with a supervisor about whether he would be allowed to work overtime on the 18th, but later admitted that he did in fact ask two supervisors whether he would be able to come into work.  Specifically, plaintiff states he asked second shift supervisor, Don Field, about whether he would be able to come in but that

---

[1] The facts as set forth in this Memorandum and Order are, unless otherwise noted, those that are not specifically disputed.

Field "never got back to me."  Plaintiff explained that he asked Field about working on his day off because when he got to work on Thursday, "the day shift was telling us they had cut the overtime out."  After his job scope meeting on Thursday, March 17 – the meeting in which employees get their assignments – plaintiff asked another second shift supervisor, Don Atchley, whether he could come in and work the next day but that Atchley's response was, "Kent, no working on your day off."  Plaintiff insists that no announcement was made at the meeting that overtime was no longer available (even though "the day shift was telling us they had cut the overtime out").  Plaintiff testified, however, that on that Thursday night, he told another employee, Jerry Moss, that he was planning on coming into work on Friday, even though he had been told not to do so, and that Moss told him, "I'll tell you what, if you come to work Friday morning they're going to fire you."

Despite being told not to come into work on Friday, plaintiff arrived at work on Friday sometime after 7:00 a.m.  Plaintiff testified he showed up at work after Atchley told him he couldn't work on Friday, "Because I had did it before."  After being initially told by first shift supervisor Dean Atkins that he could work, another first shift supervisor, Chris Sutton, interjected and explained that it would not be fair to let plaintiff work because other employees had previously been sent home as it was their days off as well.  Plaintiff was then told by Atkins, "I can't let you work."  Plaintiff testified he said "that's fine," and that at that point, "that's when Lamar Times was coming out of the break room.  And I, and I knew Lamar Times was on the same crew that I was on, but he worked a different shift."  Plaintiff testified that he turned to Atkins and asked, "well, what about Lamar Times?," explaining that Times was not supposed to be at work either.  Plaintiff states Times then cussed him in front of Atkins and Sutton and stated

3

he "ought to beat my ass" as plaintiff "just stood there and listened."  Plaintiff states Atkins told

Times to calm down and told both him and Times to "clock out and go home."

According to Atkins and not disputed by plaintiff, Times "clocked out immediately and

left."  Plaintiff, however, "went to the dressing room and then the locker room taking off my

work boots and started out of the dressing room through the shop to the time clock."  Plaintiff

states he stopped and talked to another employee, Eddie Gentry, who asked plaintiff if he was

going to work that day.  Plaintiff answered "no," at which point Gentry asked plaintiff if they

were going to let Times work.  Plaintiff answered "no," explaining to Gentry that they were both

being sent home.

A few minutes after plaintiff had been told to clock out and go home, Sutton observed

plaintiff talking to Gentry.  Plaintiff acknowledges that Sutton came over and told him he "had to

leave again."  Sutton explained that he had to tell plaintiff again to clock out and go home after

he saw plaintiff "talking to some of the other guys."  Sutton testified plaintiff was told a total of

three times that he needed to leave.  Plaintiff testified it was only twice, once by Atkins and once

by Sutton, but acknowledges that Sutton told him, "you've been asked to leave and clock out and

you're holding these guys up.  They need to start work so you need to go ahead on and clock out

and go home."  Plaintiff states he said, "okay, fine."

Atkins, Sutton, and Atchley each completed Record of Disciplinary forms regarding the

incident, as directed by SRT's Human Relations Manager, Malisa Luna.  Atkins reported on the

form that on Friday, plaintiff admitted that he had been informed the previous evening that all

shifts could not work their scheduled days off, but came in to see if he could work anyway.

Atkins explained that after plaintiff identified Times as being on his crew, the two began

4

exchanging words and that he and Sutton stopped the verbal confrontation as they believed a physical confrontation was going to occur.  Sutton described the same series of events and added that a few minutes after the confrontation, he was walking through the facility and saw plaintiff "talking to the guys on the floor" and explained to plaintiff that "he had been asked to clock out and go home once, and I didn't want to have to ask him again."  Atchley, in turn, stated he informed all employees, including plaintiff, that no one would be able to work on their day off and that plaintiff understood.

Plaintiff testified that when he clocked in on Saturday for his scheduled shift, he was summoned to meet with Atchley and Henry Mays, an assistant superintendent, who informed plaintiff that plant manager Bruce did not want plaintiff at work until Monday morning.  When Atchley told plaintiff he didn't know why Bruce did not want plaintiff at work until Monday morning, plaintiff told Atchley and Mays the "whole story" of the previous Friday morning and that he thought he was being suspended for two days because he came into work when he wasn't supposed to.  At that point, plaintiff clocked out and went home.

The President and Chief Executive Officer of SRT, Michael Jacques, testified that on Friday evening he was informed by Field, Atchley, or both, of the incident on Friday morning.  Jacques testified that he was concerned with plaintiff's "gross" insubordination on Friday morning when "he was asked to leave repeatedly ... [and] he didn't.  When asked to leave, the other employee (Times) did."  Jacques stated that after learning of the incident on Friday, he wanted to think about how to handle plaintiff over the weekend.  Plaintiff's status at that point was "pending discharge," although Jacques explained, "I don't think I had it clear in my mind on Friday.  I don't think I reached a decision."

On Monday morning, March 21, Jacques, Bruce, and Luna met "first thing" to discuss how to handle plaintiff's insubordination.  Jacques stated they reviewed plaintiff's entire personnel file including the Disciplinary Action Forms related to the events the previous week. When asked what issues the three took up in connection with the termination of plaintiff, Jacques replied:

> Well, there weren't any issues.  Kent had removed any, I mean, I tend to try to look for gray area and try to act on behalf of the employee when I can.  And he gave me no room to do anything on his behalf just because all of the actions were within his power not to do.  I mean, coming in was the result of a bold move on his part and in my mind, he was attempting to undermine the credibility and the authority of my supervisors on the shift before.  And then secondary to that, he undermined the credibility and authority of the supervisors that asked him to leave on day shift the morning of the eighteenth.  And given that, had I allowed him to come back on the floor, my supervisors' authority would be, at best, nothing.  So there, and, you know, by the time I arrived at work Monday morning, there was no, there was no decision in my mind other than the one we took.

Jacques stated he made up his mind over the weekend, determining he didn't have any choices, but that the purpose of the meeting was to re-review his file and that he may have even asked if there was anybody that could give him a reason why we don't do anything other than discharge plaintiff.

Luna likewise testified that the three met to discuss what action to take regarding plaintiff and that they reviewed plaintiff's entire personnel file and the statements written by plaintiff's supervisors.  Luna stated they were all in agreement that plaintiff's behavior regarding the incident was such that termination was the only option but that Jacques made the final decision.[2]

---

[2] Plaintiff states he reported to a meeting on Monday morning, March 21, with Bruce and Mays during which the disciplinary reports regarding his insubordination were discussed and that he informed Bruce he would like to talk to Jacques. Pl.'s Depo. at 77-82.  Plaintiff states that Bruce said okay, at which point Mays went to get Jacques.  *Id.* at 82.  Plaintiff states Jacques later walked in with Mays and that Jacques "asked Mike Bruce what's up?" and that Bruce replied, "we have decided to terminate Kent Andrews employment here with the company."  *Id.* at 82.  Plaintiff goes on to state that Jacques essentially ratified Bruce's and Mays' decision, with Jacques stating, "I will not go against my supervisors."  *Id.* at 83.  Plaintiff states he "begg[ed]" for his job and requested a suspension but that Jacques stated "he was going to stand by the decision of his

Luna noted that Times, who was less than two months shy of 50 at the time, received a written warning for his actions rather than termination but that his situation differed from plaintiff in that plaintiff was told several times not to come in but did anyway and then was seen on the floor talking to employees several minutes after being asked to leave whereas Times clocked out when told to do so.

Plaintiff was terminated on March 21, 2005, and this lawsuit followed.  Plaintiff bases his claim of age discrimination on a number of alleged remarks made by Atchley and Field.  He alleges Field thought he was taking too long to work on equipment and that Field called him an "old man" and told him he was "getting too old to do this."  Plaintiff claims that sometime after his birthday in September 2004, Atchley approached him and asked how much longer it would take him to finish repairing a piece of equipment, and that plaintiff responded, "you've got to realize ... I'm not as young as I used to be."  He claims that Atchley told him he was too old and that he needed to get a job as a greeter at Wal-Mart.  Plaintiff explained that Atchley made the statement "in a joking manner and that's the way I took it really."  Plaintiff goes on to allege that employees began calling him "old man" in the shop.  Plaintiff made clear that he accuses only Atchley and Field of making age-related comments about him.

II.

SRT moves for summary judgment on grounds that plaintiff cannot establish a *prima facie* case of age discrimination or retaliation, nor can he show that SRT's reasons for terminating his employment were pretexts for discrimination or retaliation.  SRT argues there are

---

supervisors and for me to go and clean out my locker and leave his premises."  *Id.* at 83-84.

no genuine issues of material fact with respect to these issues and that it is entitled to summary judgment as a matter of law.

## A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted).

B.

1.

Addressing first plaintiff's retaliation claim, plaintiff states in paragraphs 97 and 99 of his response to SRT's statement of undisputed facts that he bases his retaliation claim on the fact that he allegedly complained to Luna one time in January 2005 that Atchley told him he was too old to do his job and that he believes he was terminated because of his complaint to Luna. Assuming plaintiff did so complain to Luna, "the interval of two months between the complaint and [plaintiff's] termination so dilutes any inference of causation that [this Court is] constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link." *Kipp v. Missouri Highway and Transp. Com'n,* 280 F.3d 893, 897 (8th Cir. 2002).[3]  SRT has properly supported its motion for summary judgment on plaintiff's retaliation claim and plaintiff has not come forward with specific facts showing that there is a genuine issue for trial on this claim. *Matsushita*, 475 U.S. at 587.

2.

The Court now turns to plaintiff's age discrimination claim.  The ADEA makes it unlawful for an employer to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.  29 U.S.C. § 623(a)(1).  Protection under the ADEA extends to persons age forty and older.  29 U.S.C. § 631.  *See also Denesha v. Farmers Ins. Exchange*, 161

---

[3] To establish a *prima facie* case of retaliation, the plaintiff must show (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action.  *See Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078-79 (8th Cir. 2005).

F.3d 491, 497 (8th Cir. 1998), *cert. denied*, 526 U.S. 1115 (1999); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004).  To establish a claim under the ADEA, a plaintiff must show that his employer intentionally discriminated against him.  *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 674 (8th Cir. 1998) (citations omitted).  A plaintiff may meet his burden of establishing intentional age discrimination by relying on either direct or indirect evidence.  *Denesha*, 161 F.3d at 497 (citation omitted).  To avoid summary judgment in a case in which there is no direct evidence of intentional discrimination, a plaintiff must establish a *prima facie* case of age discrimination by producing evidence that (1) he is a member of a protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was discharged; and (4) where, as here, the plaintiff's responsibilities were not reassigned to a specific individual, it has been shown that "age was a factor in the employer's decision to terminate."  *Hitt*, 356 F.3d at 924 (citation omitted).  Once the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision.  *Zeigler*, 133 F.3d at 675.  If the employer provides a non-discriminatory reason, the presumption of discrimination disappears, and the burden shifts back to the plaintiff to show that the proffered reason is actually a pretext for intentional discrimination.  *Id.*[4]

Given that SRT has proffered legitimate, nondiscriminatory reasons for the adverse employment action taken against plaintiff, and plaintiff has presented whatever evidence he has to show that the proffered reasons were a pretext for age discrimination, this Court, although it is

---

[4] Plaintiff apparently agrees in his response to SRT's motion for summary judgment that his claims are properly analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1-2, 4.

10

far from clear, will assume that plaintiff has presented a *prima facie* case of age discrimination with respect to his termination and will focus on the pretext stage of the *McDonnell Douglas* burden-shifting framework. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 856 (8th Cir. 2005) (Colloton, J., concurring).

Plaintiff argues SRT's explanation for his termination was a mere pretext for age discrimination because he was disciplined more harshly than Lamar Times for the same rule violation. This argument is unavailing because Times was less than two months shy of age 50 at the time of the incident and, thus, also a member of the protected class under the ADEA. *See Hitt*, 356 F.3d at 925. Moreover, the undisputed evidence demonstrates that their conduct was not comparable. Even if, as claimed by plaintiff, Times knew not to come into work but did anyway, plaintiff does not dispute that Times clocked out immediately and left when told to do so, whereas plaintiff admits he was told at least twice to leave, once by Atkins and once by Sutton, and that Sutton told him, "you've been asked to leave and clock out and you're holding these guys up. They need to start work so you need to go ahead on and clock out and go home." In this respect, Jacques testified that he was concerned with plaintiff's "gross" insubordination on Friday morning when "he was asked to leave repeatedly ... [and] he didn't. When asked to leave, the other employee (Times) did." These undisputed facts provided SRT with a legitimate, non-discriminatory basis for termination. *Hitt*, 356 F.3d at 925.

The alleged age-related comments by Atchley and Fields do not raise an inference of age discrimination because plaintiff has not presented any evidence that either man made the decisions that negatively affected him. "While 'stray remarks' regarding age may be relevant to establishing a *prima facie* case or pretext under some circumstances, such comments are not

11

persuasive evidence of motive when the remarks are made by persons other than a decisionmaker." *Hitt*, 356 F.3d at 925.  Accordingly, even if the alleged remarks of Atchley and Fields could be taken as evidence of motive of these individuals to discharge persons based on age, they do not support an inference that Jacques' decision to terminate plaintiff was so motivated.[5]


                                        III.

        For the foregoing reasons, the Court grants SRT's motion for summary judgment in its entirety.  Judgment will be entered accordingly.


                IT IS SO ORDERED this 9th day of November, 2006.

                                        /s/Susan Webber Wright

                                        UNITED STATES DISTRICT JUDGE

---

[5] Or, if plaintiff is so arguing, the decision of Bruce and/or Mays.  *See* n.2, *supra*.

12